# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **PATRICK T. BRYSON** ) | |
| 1521 Lindenhurst Dr. ) | |
| Dayton, OH 45459 ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Civil Action No. 3:21-cv-243 |
| v. ) | |
| ) | Judge |
| ) | |
| **TROY PHYSICAL MEDICINE** ) | |
| **AND REHAB, LLC** ) | |
| C/o Tracy Hoyt, Statutory Agent ) | |
| 1025 Huron Trail ) | |
| Jamestown, OH 45335 ) | |
| ) | |
| **and** ) | |
| ) | **Jury Demand Endorsed Hereon** |
| **BUCKEYE PHYSICAL MEDICINE** ) | |
| **AND REHAB, LLC** ) | |
| Karla Korth Talledo, Statutory Agent ) | |
| 4554 Grand Strand Dr. ) | |
| Grove City, OH 43123 ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

Now comes the Plaintiff, Patrick T. Bryson, by and through counsel, and proffers this Complaint for damages against Defendant Troy Physical Medicine and Rehab, LLC ("Defendant TPMR") and Defendant Buckeye Physical Medicine and Rehab, LLC ("Defendant BPMR") (collectively "Defendants").

### PARTIES/ JURISDICTION/ VENUE

1. Plaintiff, Patrick T. Bryson, (hereinafter "Plaintiff") is a United States citizen and a resident of the State of Ohio.

2. Defendants are Ohio limited liability companies which owned and operated the facility where Plaintiff worked in Miami County, Ohio.

3. At all times relevant hereto, Plaintiff was an "employee, contractor, or agent" as those terms are defined under the False Claims Act, 31 U.S.C. § 3730(h)

4. At all times relevant hereto, Defendants were covered entities under § 3730(h)(1).

5. This Court has federal question jurisdiction over this action pursuant to the False Claims Act, 31 U.S.C. § 3730 *et seq.,* and 28 U.S.C. § 1331.

6. This Court has jurisdiction over Plaintiff's state law claims pursuant to supplemental jurisdiction as codified at 28 U.S.C. § 1367.

7. Venue is proper in this forum pursuant to 28 U.S.C. §1391, because Plaintiff entered into an employment relationship with Defendants in the Southern District of Ohio and performed his job duties there and Defendants are doing and have done substantial business in the Southern District of Ohio.

## STATEMENT OF FACTS

8. Plaintiff began working as a chiropractor at Defendant TPMR in approximately 2015.

9. Approximately six months after Plaintiff began working at Defendant TPMR, Defendant TPMR hired Defendant BPMR to manage Defendant TPMR's business. Specifically, Defendant BPMR was responsible for managing, among other things, Defendant TPMR's payroll, scheduling personnel, performing accounting, advertising, hiring, firing, setting compensation, and buying supplies.

10. In approximately February 2018, Plaintiff entered into a "Leased Employee Agreement" (hereinafter, "Agreement") (See attached hereto as Exhibit A). Exhibit "A" of the

Agreement provided that Defendant TPMR would pay Plaintiff a salary equal to 40% of Defendant TPMR's "Net Profits."

11. Section 17 of the Agreement defined Defendant TPMR's "Net Profits" as follows:

> The term "Net Profit" shall be defined as the remainder of The Company's gross revenue from its health care clinic after subtracting all initial start-up costs (including amortization of any debt incurred for start-up costs), expenses of operation, all salaries and wages, administrative costs, depreciation amortization of leasehold improvements, management fees, and any other expenses of The Company, as determined in the sole discretion of The Company.

12. Plaintiff became concerned that Defendants were not properly calculating the "Net Profits" as defined under the Agreement, since Plaintiff was not receiving payouts consistent with the revenues Defendant TPMR received.

13. Defendant BPMR began providing Plaintiff copies of monthly expense reports that purportedly showed the expenses of Defendant TPMR. A number of the expenses listed on the reports, however, could not have been expenses incurred by Defendant TPMR. For instance, Plaintiff saw an advertising expense for radio advertisement, which could not be proper since Defendant TPMR performed no radio advertisement. Likewise, the nurse practitioner leased to Defendant TPMR continued to be the same, even though the nurse practitioner's time at Defendant TPMR was cut in half.

14. Defendant BPMR suggested that Defendant TPMR increased the services it offered by including nurse practitioner services. Given that Defendant TPMR did not employ any nurse practitioners, Defendant BPMR hired a nurse practitioner to perform services on Defendant TPMR's behalf.

15.     In late July 2019, Plaintiff became aware that the nurse practitioner Defendant BPMR hired, Mary Wellner, treated a patient from a different chiropractic practice in Defendant TPMR's facility.

16.     Ms. Wellner provided nurse practitioner services at Defendant TPMR on Tuesdays and Thursdays, and she spent the rest of her time each week providing nurse practitioner services at a chiropractic practice located in Centerville, Ohio. Defendant BPMR managed the other chiropractic practice as well.

17.     Plaintiff became aware of the situation when the front-desk worker, Justine Ford, informed Plaintiff that one of the patients at the facility was not one of Defendant TPMR's patients. Ms. Ford informed Plaintiff that the patient was a patient at a chiropractic practice located in Centerville, Ohio.

18.     Plaintiff immediately confronted Ms. Wellner about the situation, given the seriousness of the situation.

19.     Ms. Wellner responded to Plaintiff's inquiry by saying that she saw patients from the other chiropractic practice at Defendant TMPR's facility because it was more convenient for the patient. Ms. Wellner claimed that she did not think it mattered which location she saw the patient, as Defendant BPMR employed her.

20.     Ms. Wellner confirmed to Plaintiff that she had engaged in this practice for both cash-based patients and patients who were billing for Medicare services (e.g., trigger point injections). Ms. Wellner also confirmed to Plaintiff that she had coded the Medicare patients as though she had treated them at the office the chiropractor practice at which they were a patient. Ms. Wellner was able to do this by logging onto Team View remotely, using the other chiropractor practice's billing code for the other office.

4

21. Plaintiff informed Ms. Wellner that she was engaging in "Medicare fraud."

22. Plaintiff based that comment upon the fact that: (1) Medicare reimburses for the general overhead expenses used to provide services at a particular location and, therefore, they provide a higher reimbursement amount for the services even though those services never took place at the other chiropractor practice's facility in Centerville; and (2) Medicare patients of the Centerville practice were not covered for treatment at Defendant TPMR's facility as the patients' insurance did not approve treatment at Defendant TPMR's facility.

23. Ms. Wellner concluded her conversation with Plaintiff by saying, "I'll talk to Buzz [Dr. Korth]."

24. A few days later, on or about August 5, 2019, Plaintiff sent Dr. Korth a text message asking if Ms. Wellner asked him "if she could see Centerville patients at Troy office?" Plaintiff informed Dr. Korth, "I just found out about it and apparently she has been doing it for awhile."

25. Dr. Korth responded by sending Plaintiff a screenshot of a text message exchange between him and Ms. Wellner that took place after Plaintiff had confronted Ms. Wellner about her actions. In the exchange, Ms. Wellner asked Dr. Korth, "[i]s there a huge problem if I have a Centerville patient come to Troy to get his testosterone injection?" Dr. Korth responded, "No they can't come to Troy."

26. Upon seeing that exchange, Plaintiff stated to Dr. Korth, "I told her she had to stop, before she sent you that text … I noticed that she didn't tell you [in the exchange] she has been billing patients' insurance at Centerville and seeing them in Troy." Dr. Korth responded to that text immediately stating, "Call when you get a chance."

27. Over the following weeks, Plaintiff began noticing that Defendant BPMR started treating him differently. For instance, after Plaintiff raised his complaint regarding Ms. Wellner,

5

BPMR started scheduling patients under BPMR's name as opposed to his name. Previously, BPMR always scheduled Dr. Bryson's patients under his name.

28. Additionally, Mike Adamets, who was employed by Defendant BPMR in order to supervise the chiropractors and nurse practitioners at the facilities Defendant BPMR managed, including Defendant TPMR, stopped discussing important issues with Plaintiff that Mr. Adamets had previously discussed. Prior to Plaintiff's complaint, for example, Mr. Adamets discussed marketing issues and changes with Plaintiff, as attracting new patients is an important part of Defendant TPMR's business. After Plaintiff complained, however, Mr. Adamets only discussed marketing issues with Travis Hensley, who Defendants employed as a case manager.

29. In late September 2019, Plaintiff discussed the Medicare fraud issues with Defendant TPMR's owner, Tracy Hoyt. During that phone call, Plaintiff asked Ms. Hoyt, "Did they [Defendant BPMR] tell you about the Medicare fraud issue?," indicating that Plaintiff had felt things had been weird since he made those complaints to Dr. Korth. Ms. Hoyt responded by saying that she was completely unaware of the issue. Ms. Hoyt indicated that she would follow up with Dr. Korth about the issue.

30. Thereafter, Plaintiff spoke again to Ms. Hoyt about the Medicare fraud issue. During that call, Ms. Hoyt indicated that she spoke to Dr. Korth and Mr. Adamets about Plaintiff's concern about Medicare fraud. Ms. Hoyt stated that Dr. Korth and Mr. Adamets claimed that Ms. Wellner's actions had nothing to do with Medicare fraud because, according to them, the services Ms. Wellner provided at the wrong facility were only cashed-based services (e.g., hormone replacement therapy and weight loss).

31. Soon after Plaintiff's conversation with Ms. Hoyt, Dr. Korth came to Defendant TPMR's Troy office for the first time in years. While there, Dr. Korth asked to speak with Plaintiff

alone. Dr. Korth told Plaintiff, "I've heard you've been asking a lot of questions, being difficult, and going to Tracy." Dr. Korth followed up that statement by saying, "This is my office, not Tracy's [Hoyt]. I'm taking this office from Tracy, so stop talking to her. And, if you don't like it, you can leave."

32. On or about October 18, 2019, Ms. Hoyt reached out to Plaintiff to request the name of the patient who Ms. Wellner treated at the wrong facility while billing to insurance rather than on a cash-basis. Plaintiff responded via text message that day with the patient's name. Plaintiff also indicated that the patient "lives in Piqua. She has Medicare/BCBS."

33. Weeks later, Defendants terminated Plaintiff's employment. During the termination meeting, Ms. Hoyt did not provide an explanation as to why Plaintiff's employment was being terminated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL RETALIATION AGAINST DEFENDANTS
### False Claims Act, 31 U.S.C. § 3730(h)

34. Plaintiff incorporates the allegations set forth above as if fully restated herein.

35. Plaintiff engaged in protected conduct under 31 U.S.C. § 3730(h) when, among other things, he complained on numerous occasions that Defendants engaged in Medicare fraud by improperly billing Medicare patients for services at the wrong facility.

36. Plaintiff suffered an adverse employment action when Defendants terminated Plaintiff.

37. There is a causal connection between Plaintiff's complaints of Medicare fraud and his termination given, among other reasons: Defendant BPMR posted Plaintiff's job position weeks after Plaintiff originally raised Medicare fraud claims; Dr. Kroth personally threatened

Plaintiff after Plaintiff advised Ms. Hoyt about the Medicare fraud; and, Plaintiff was terminated weeks after providing specific information demonstrating that Dr. Kroth's claim that Ms. Wellner only treated cash-based clients at the wrong facility is simply false.

38. Defendants have failed to provide any legitimate, non-retaliatory reason for Plaintiff's termination.

39. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and is continuing to suffer from a loss of income and benefits and has experienced emotional distress, mental anxiety, and resulting physical conditions for which he should be compensated.

## COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST DEFENDANT BPMR

40. Plaintiff incorporates the allegations set forth above as if fully restated herein.

41. Plaintiff entered into the Agreement with Defendant TPMR in February 2018 that required Defendant TMPR to pay Plaintiff a salary equal to 40% of Defendant TMPR's Net Profits. The Agreement defines Net Profits as Defendant TMPR's revenues minus certain of Defendant TMPR's expenses.

42. Defendant BPMR was aware of the Agreement between Plaintiff and Defendant TMPR, including the manner in which Plaintiff's salary was paid pursuant to the Agreement.

43. Defendant BPMR tortiously interfered with Plaintiff's rights under the Agreement by attributing its expenses toward Defendant TMPR's expenses, thereby reducing Plaintiff's salary under the Agreement.

44. Plaintiff experienced damages as a result of Defendant BPMR's tortious interference of the Agreement because, among other things, he received a reduced salary as a result.

**WHEREFORE**, Plaintiff demands a trial by jury and judgment against Defendants, in an amount to be determined at trial, as follows:

A. That Plaintiff be awarded backpay that he is entitled to as a result of Defendants' misconduct;

B. That Plaintiff be awarded punitive damages;

C. That Plaintiff be awarded liquidated damages;

D. That Plaintiff be awarded her attorney fees and costs incurred in the investigation and prosecution of this matter; and

E. That Plaintiff be awarded such other and further relief which the Court deems just, proper and equitable under the circumstances.

Respectfully submitted,

/s/ Bradley L. Gibson
Bradley L. Gibson (0085196)
**GIBSON LAW, LLC**
9200 Montgomery Road, Suite 11A
Cincinnati, OH 45242
(brad@gibsonemploymentlaw.com)
Phone: (513) 834-8254
Fax: (513) 834-8253

*Counsel for Plaintiff*

## JURY DEMAND

    Now comes Plaintiff, by and through counsel, and hereby demands a trial by jury on all issues of this matter.

                                            /s/ Bradley L. Gibson
                                            Bradley L. Gibson (0085196)